**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| ANGELIQUE INCORVIA, | ) | CASE NO. 1:22-CV-01911-DCN |
| Plaintiff, | ) | |
| | ) | U.S. DISTRICT JUDGE |
| | ) | DONALD C. NUGENT |
| v. | ) | |
| | ) | U.S. MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.      INTRODUCTION

Plaintiff Angelique Incorvia ("Ms. Incorvia") seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF Doc. 1). U.S. District Judge Donald C. Nugent has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. For the reasons set forth below, I RECOMMEND that the Court VACATE and REMAND the ALJ's decision to the Commissioner.

## II.      PROCEDURAL HISTORY

On August 19, 2020, Ms. Incorvia filed DIB and SSI applications, originally alleging a disability onset date of September 9, 2016. (Tr. 444, 451).[1] The alleged disability onset date was later amended at her administrative hearing to October 17, 2019—one day after the date of an unfavorable decision on a prior disability claim. (Tr. 257, 281-93, 451). These claims were denied

---

[1] The administrative transcript appears in ECF Doc. 6 on CM/ECF.

1

initially and upon reconsideration. (Tr. 352, 357, 364, 369). Ms. Incorvia requested a hearing before an administrative law judge ("ALJ"). (Tr. 410).

On September 15, 2021, the ALJ held a telephone hearing during which Ms. Incorvia, represented by counsel, and a vocational expert testified. (Tr. 252-77). On October 5, 2021, the ALJ issued a written decision finding that Ms. Incorvia was not disabled under the Social Security Act. (Tr. 20-38). The ALJ's decision became final on August 26, 2022, when the Appeals Council declined further review. (Tr. 1-5). Ms. Incorvia filed a Complaint on October 25, 2022, challenging the Commissioner's final decision. (ECF Doc. 1). She raises the following assignments of error:

(1) Whether the ALJ erred when she failed at Step Two to find small fiber neuropathy, carpal tunnel syndrome, diabetes mellitus and necrobiosis lipoidica to be severe impairments, and further erred by not evaluating them appropriately in the RFC findings.

(2) The ALJ failed to properly evaluate Plaintiff's pain and include these limitations in the RFC.

(ECF Doc. 8, PageID#2015).

### III.   BACKGROUND INFORMATION[2]

#### A.  Personal, Educational, and Vocational Experience

Ms. Incorvia is unmarried, and she lives with her four children and boyfriend. (Tr. 259). She has a middle school education and was enrolled in special education classes. (Tr. 36, 260). She does not have a GED or any specialized job training. (*Id.*)  She currently receives food stamps and medical benefits. (*Id.*) Her past relevant work was employment as a hand packager and cleaner. (Tr. 36).

---

[2] Because Ms. Incorvia's assignments of error revolve around her impairments of carpal tunnel syndrome, diabetes, neuropathy,  a skin condition, and the ALJ's ultimate physical RFC finding (*see* ECF Doc. 8, PageID#2015), summary of the relevant background information will be limited to evidence related to her physical RFC.

### B. **Relevant Hearing Testimony**

#### 1. *Ms. Incorvia's Testimony*

Ms. Incorvia testified that she has been unable to work since October 2019 because her body is getting weaker. (*See* Tr. 262-63). She testified that she cannot grip objects, "constantly" falls, and has sores/rashes around her legs that cause pain when they are touched. (Tr. 262-63).

Ms. Incorvia also testified that she received a one-shot treatment for the carpal tunnel syndrome in her right hand. (Tr. 264). She stated that she cannot receive too many of these shots because she already receives shots for her back – and the shots raise her body's sugar level, which affects her diabetes. (*Id.*) Ms. Incorvia testified that her medical providers have also prescribed Gabapentin. (*Id.*) She further stated that she can only take this medication at night because it makes her feel "groggy." (*Id.*)

Regarding the sores/rashes on her leg, Ms. Incorvia testified that her doctors conducted a biopsy to determine the cause. (Tr. 265). She testified that she believes her medical providers stated that these rashes/sores stem from diabetes. (*Id.*) She stated that the sores eventually turn into ulcers, which is why they are sensitive to touch. (*Id.*) She testified that these sores spread through her legs "and everything." (*Id.*) Ms. Incorvia testified that she is taking Metformin in the morning and at night as treatment for her diabetes. (*Id.*) She stated that her medical providers are trying to determine if Metformin helps control her sugar levels. (*Id.*)

Ms. Incorvia testified that she is able to get her children up in the morning and get them ready for school. (*See* Tr. 267). She testified that she has difficulty performing household chores, and that she relies on her oldest daughter and other children to assist her. (*See id.*). Ms. Incorvia stated that it takes her "a whole day" to clean a room because she must take multiple breaks due to pain in her right side. (*Id.*) Ms. Incorvia stated that she does the household shopping, but she

typically has someone accompany her. (Tr. 268) She testified that she does not like driving alone, and that she cannot stand for a long period of a time while shopping because her back starts to hurt and her leg "starts to give out." (*Id.*) Ms. Incorvia also testified that she prepares meals for the household, but it must be a meal that can be placed in the oven and does not require "constantly stand[ing] up." (*Id.*) She stated that her daughter does the laundry. (*Id.*) With respect to cleaning around the home, Ms. Incorvia testified that she tries to wipe down the sink and counters in the sink. (Tr. 269). She stated that her kids take care of yard work because she can no longer perform this task. (*Id.*)

### 2.  Vocational Expert's Testimony

As a first hypothetical, the ALJ asked the vocational expert ("VE") whether an individual with Ms. Incorvia's age, education, and work experience could perform work at the light exertional level if this person cannot climb ladders, ropes, and scaffolds; can frequently climb ramps and stairs; can frequently stoop, kneel, crouch, and crawl; should avoid concentrated exposure to extreme cold and excessive vibrations, and all exposure to unprotected heights; can perform simple, routine tasks (but not at a production rate pace); and is limited to occasional routine workplace changes. (Tr. 274). The VE opined that this individual could not perform past relevant work, but could perform work as a cafeteria attendant, merchandise marker, and laundry folder. (Tr. 274-75).

Ms. Incorvia's counsel asked the VE what the allowable tolerances were for off task behavior and absenteeism. (Tr. 275). With respect to tolerance for off task behavior, the VE opined that being off task 15% of the workday is allowable, but 20% of the workday would be work preclusive. (*Id.*). The VE opined that an employer, on average, would permit six or seven days of absence a year. (*Id.*)

Ms. Incorvia's counsel then asked the VE whether an individual could perform work if they required an additional hour of breaks per day. (*Id.*). The VE opined that this limitation would require an accommodation, if permitted, because this limitation would cause this individual to exceed 20% of the workday off task. (*Id.*)

### C. **Relevant Medical/Non-Medical Opinion Evidence**

#### *1. State Agency Opinions*

In September 2020, Dr. Lynne Torello, M.D., reviewed the medical record at the initial level of consideration. Consistent with the RFC assessed by the ALJ as part of Ms. Incorvia's previous disability claim, Dr. Torello determined that Ms. Incorvia remained capable of lifting and/or carrying 20 pounds occasionally and 10 pounds frequently, and standing and sitting for six hours each in an eight-hour workday. (Tr. 314-15). Dr. Torello additionally determined that Ms. Incorvia should avoid concentrated exposure to extreme cold and all exposure to unprotected heights. (*Id.*) In March 2021, Dr. Indira Jasti, M.D., reviewed the record at the reconsideration level and agreed with Dr. Torello's findings. (Tr. 335.)

#### *2. Jack Rutkowski, M.D.*

In May 2021, Dr. Jack Rutkowski completed a checkbox medical form assessing Ms. Incorvia's physical capacity. (Tr. 1817-18). Dr. Rutkowski opined that Ms. Incorvia could occasionally lift five pounds; never stand or walk during an eight-hour workday; sit for 30 minutes total during an eight-hour workday; and never reach, push/pull, or perform fine or gross manipulation. (*Id.*) His explanations for these limitations were "physical exam," "history of patient pain," and "pain." (*See generally id.*)

### D. **Relevant Medical Evidence**

#### *1. Diabetes and Necrobiosis Lipoidica*

On October 22, 2020, Ms. Incorvia was admitted to the hospital due to syncopal episodes. (Tr. 1150). Medical providers noted that her blood glucose levels were elevated at 244. (Tr. 1154). She was diagnosed with syncope, nausea, vomiting, and dehydration. (Tr. 1156). Her physical examinations reflected intact sensation and strength, a normal gait, and no edema or tenderness. (Tr. 1153, 1167). At discharge, Ms. Incorvia's diagnoses included diabetes mellitus without complication, which was noted to be under "fair control." (Tr. 1478).

On August 3, 2021, Ms. Incorvia was examined by a dermatologist for complaints of a painful rash on her lower extremities. (Tr. 1948). She reported that this rash had been an issue for two years. (*Id.*). Ms. Incorvia indicated that medical providers previously told her that the rash was related to her diabetes, although her diabetes had improved. (*Id.*). The dermatologist provided a differential diagnosis of either psoriasis or necrobiosis lipoidica diabeticorum and requested a punch biopsy for Ms. Incorvia. (Tr. 1952). On August 30, 2021, Ms. Incorvia received a punch biopsy. (Tr. 1948). On September 14, 2021, the punch biopsy results revealed that her rash was necrobiosis lipoidica. (Tr. 178).

### 2. *Carpal Tunnel Syndrome and Small Fiber Neuropathy*

On May 18, 2018, Ms. Incorvia underwent a skin biopsy. (Tr. 848-49). This skin biopsy demonstrated a reduction of epidermal fibers at all sites, consistent with severe small fiber neuropathy. (*Id.*).

On September 30, 2019, Ms. Incorvia saw Dr. Pioro, a rheumatologist. She complained of diffuse widespread pain. (Tr. 562). Ms. Incorvia's active problems include type 2 diabetes mellitus without complication, left wrist pain, and small fiber neuropathy of unknown etiology. (Tr. 569-70). Examination showed minimal decrease in range of motion of the shoulders, mild subacromial tenderness, biceps tenderness, trochanteric and gluteal bursitis, moderately tender bilateral medial

joint spaces, mild bilateral anserial bursitis, mild posterolateral tenderness of both ankles, and tenderness to palpation of the spine with diffuse moderate myofascial tenderness most prominent over the shoulder girdle and lumbar area. (Tr. 572). She also had a normal gait, normal muscle bulk and tone in her arms and legs, no edema, and no inflammation of the fingers, wrists, or elbows. (Tr. 571-72). She was able to make full, tight fists bilaterally. (*Id.*). Dr. Pioro did not see evidence suggesting Ms. Incorvia had either a systemic inflammatory disease or connective tissue disease. (Tr. 572).

On November 1, 2019, Ms. Incorvia met with Dr. Ray for a rheumatology consult. (Tr. 558). Ms. Incorvia reported difficulty opening cans and jars, with pain and swelling in her right hand and tingling and numbness in her fingers. (*Id.*). On examination, Dr. Ray observed some tenderness in Ms. Incorvia's wrists, hands, and right elbow, and mild swelling in her right hand. (Tr. 563). Ms. Incorvia was able to make full fists bilaterally and examination of her legs was unremarkable. (*Id.*). Dr. Ray noted that she had a "low suspicion" for an inflammatory arthritis or connective tissue disease being the cause of Ms. Incorvia's pain. (Tr. 564). Dr. Ray also stated that she would check Ms. Incorvia's labs and x-rays to rule out ankylosing spondylitis and/or rheumatoid arthritis. (*Id.*). Dr. Ray diagnosed Ms. Incorvia with polyarthralgia, Vitamin D deficiency, idiopathic small fiber sensory neuropathy, lumbar spondylosis, depression, and obesity. (*Id.*). X-rays of her right hand from November 3, 2019, revealed that Ms. Incorvia had a broken finger without dislocation (Tr. 695),

A November 21, 2019, EMG showed right median nerve sensory axonal neuropathy across the wrist consistent with entrapment neuropathy. (Tr. 310). On that same day, Ms. Incorvia reported right hand numbness. (Tr. 320). Her physical examination notes indicated discriminatory sensation was limited over the right median nerve distribution, and she had decreased grip strength

and pinch in her right hand. (*Id.*). On November 27, 2019, Ms. Incorvia met with Dr. Craciun (a neurologist) for evaluation and treatment of small fiber type sensory peripheral neuropathy, chronic pain syndrome, lumbar canal stenosis, obesity, and polyarthralgia. (Tr. 553). Dr. Craciun noted that Ms. Incorvia reported pain and discomfort with burning sensation in her hands and a previous diagnosis of carpal tunnel syndrome based on an EMG, as well as a diagnosis for small fiber type sensory peripheral neuropathy. (*Id.*).  The physical examination notes documented full strength, a minimal decrease in pinprick and light touch sensation with upper limits at the knees and elbow, mildly positive Tinel findings in both wrists, stiffness and tenderness in the wrists and metacarpophalangeal joints, mild antalgic gait, and no use of an ambulatory aid. (*Id.*). Dr. Craciun advised Ms. Incorvia to increase her Neurontin dosage, prescribed Aspercreme (a topical cream) for her wrists, and referred her to a hand surgeon to discuss potential surgery for her carpal tunnel syndrome. (*Id.*). Ms. Incorvia failed to show for her appointments with the surgeon in January and March 2020. (Tr. 552, 1643).

On November 16, 2020, Ms. Incorvia attended a follow-up appointment with Dr. Craciun. (Tr. 1335). Ms. Incorvia was "doing better" and "d[id] not seem to have any specific problems." (Tr. 1336). The examination notes indicated polyarthralgia pain and stiffness in her hands and wrists, and decreased sensation in pinprick and light touch sensation in stocking-glove distributions at the upper limits of the knees and elbows. (*Id.*). Dr. Craciun suggested a re-assessment by rheumatology. (*Id.*). Ms. Incorvia also had a minimal broad-based gait and decreased sensation, but full strength and no tenderness. (*Id.*). Dr. Craciun's impressions were bilateral carpal tunnel syndrome, small-fiber-type sensory peripheral neuropathy, restless legs syndrome, obesity, obstructive sleep apnea syndrome, and polyarthralgia. (*Id.*).

On June 3, 2021, Ms. Incorvia attended another follow-up appointment with Dr. Craciun. (Tr. 1867). The objective findings remained the same as her previous follow-up appointment. (*See* Tr. 1867-68). Dr. Craciun encouraged Ms. Incorvia to stay hydrated and remain on her current dosage of Neurontin at bedtime. (*Id.*).

## IV.    THE ALJ'S DECISION

In her October 2021 decision, the ALJ first found that Ms. Incorvia met the insured status requirements of the Social Security Act through December 31, 2023. (Tr. 23). The ALJ then determined that Ms. Incorvia had not engaged in substantial gainful activity since October 18, 2019 (the amended alleged disability onset date). (*Id.*) The ALJ next found that Ms. Incorvia had the following severe impairments: degenerative disc disease; depressive, bipolar, and related disorders; anxiety and obsessive-compulsive disorders; and attention hyperactivity disorder. (Tr. 24). However, the ALJ found that none of these impairments—individually or in combination— met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix. (Tr. 26).

The ALJ also determined that Ms. Incorvia has the residual functional capacity to perform light work except that she can never climb ladders, ropes, or scaffolds; frequently climb ramps and stairs; frequently stoop, kneel, crouch, and crawl; should avoid concentrated exposure to extreme cold and excess vibration; should avoid all exposure to unprotected heights; can perform simple routine tasks, but not at a production rate pace; and can adapt to occasional routine workplace changes. (Tr. 30).

The ALJ next determined that Ms. Incorvia was capable of performing her past relevant work as a cleaner. (Tr. 36). The ALJ explained that this work does not require the performance of work-related activities precluded by her RFC. (*Id.*) In addition to Ms. Incorvia's past relevant

9

work, the ALJ also determined that considering Ms. Incorvia's age, education, work experience, and RFC, there are other jobs that exist in significant numbers in the national economy that she could perform, including employment as a cafeteria attendant, merchandise marker, and laundry folder. (Tr. 36-37). The ALJ noted that transferability of job skills was not an issue in this case because Ms. Incorvia's past relevant work was unskilled. (Tr. 37). Accordingly, the ALJ concluded that Ms. Incorvia was not disabled, as defined in the Social Security Act, from the alleged disability onset date through the date of the ALJ's decision. (Tr. 38).

## V.    LAW & ANALYSIS

### A.    Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

**B.  Standard for Disability**

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient

evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

### C. <u>The ALJ Erred in Her Step Two Evaluation of Ms. Incorvia's Carpal Tunnel Syndrome, Small Fiber Neuropathy, and Necrobiosis Lipoidica.</u>

Ms. Incorvia asserts that the ALJ erred in her Step Two severity analysis of her impairments of small fiber neuropathy, carpal tunnel syndrome, and necrobiosis lipoidica. (*See* ECF Doc. 8, PageID#2028-32). She first argues that the ALJ failed to find that her carpal tunnel syndrome was a severe impairment. (*Id.* at PageID#2028-29). She then argues that the ALJ "entirely" failed to consider whether her small fiber neuropathy was a severe impairment. (*Id.* at PageID#2029). She next argues that the ALJ improperly determined that her necrobiosis lipoidica was a non-severe impairment. (*Id.* at PageID#2029-30). She also argues that the ALJ erred in her RFC assessment because the ALJ failed to adequately discuss and incorporate limitations for Ms. Incorvia's impairments of small fiber neuropathy, carpal tunnel syndrome, and necrobiosis lipoidica. (*Id.* at PageID#2030-32). Finally, she argues that the ALJ erred in the RFC assessment because the ALJ failed to adequately discuss and incorporate limitations for the non-severe impairments in the RFC determination. (*Id.* at PageID#2030-32). Each argument will be addressed in turn.

### 1. *Legal Standard – Step Two*

At Step Two of the sequential evaluation process, an ALJ must determine with a claimant's medically determinable impairment is a "severe" impairment. *See* 20 C.F.R. § 404.1520(a)(4)(ii). A "severe" impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c). "Step two has

been described as a '*de minimus* hurdle'; that is, 'an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n.2 (6th Cir. 2007) (quoting *Higgs v. Bowen,* 880 F.2d 860, 862 (6th Cir.1988)). When an ALJ finds severe and non-severe impairments at Step Two and continues with the subsequent Steps in the sequential evaluation process, any error at Step Two is harmless. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

Prior to determining whether a claimant can perform her past relevant work at Step Four, an ALJ determines a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity."); 20 C.F.R. § 404.1520(e) ("[W]e will assess and make a finding about your [RFC] based on all the relevant medical and other evidence in your case record[.]"). RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1). Agency regulations direct that the ALJ's assessment of a claimant's RFC is to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. SSR 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

### 2. *Carpal Tunnel Syndrome*

Ms. Incorvia next argues that the ALJ should have found her carpal tunnel syndrome to be a severe impairment at Step Two. (ECF Doc. 8, PageID#2028-29). Specifically, she argues that the ALJ failed to mention a November 2019 EMG—which she points out is not part of the administrative record—that supported a diagnosis of carpal tunnel syndrome. (*Id.* (citing Tr. 25,

310)). She also notes that the ALJ acknowledged swelling in her hand joints, tenderness and stiffness in her wrists and hand joints, mildly positive Tinel findings in both wrists, a recommendation to increase her nerve pain mediation and apply a topic pain relief agent, and a referral to a hand surgeon. (*Id.* (citing Tr. 25-26)). Given all this evidence, Ms. Incorvia maintains that the ALJ should have found her carpal tunnel syndrome to be a severe impairment. (*Id.* at PageID#2028-29). Ms. Incorvia's Step Two argument lacks merit.

The ALJ appropriately concluded that Ms. Incorvia's carpal tunnel syndrome was not a severe impairment at Step Two. I first note that Ms. Incorvia's argument that the ALJ did not build a logical bridge by not mentioning a November 2019 EMG is not persuasive. Looking more closely at this decision, the ALJ acknowledged Ms. Incorvia's carpal tunnel diagnosis and even referenced the November 2019 EMG, although not within the administrative record, that Ms. Incorvia claims was overlooked. (Tr. 25-26 ("Atanase Craciun, MD diagnosed her with right carpal tunnel syndrome when he saw her on November 27, 2019, citing an EMG study.")). Further, it is well-established that a diagnosis by itself says nothing about the severity of a condition. *See Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 930 (6th Cir. 2007) ("The mere existence of…impairments…does not establish that [the claimant] was significantly limited from performing basic work activities for a continuous period of time."); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("[M]ere diagnosis of [a condition]…says nothing about the severity of the condition.").

Moreover, the ALJ discussed other treatment records pertaining to Ms. Incorvia's carpal tunnel syndrome and provided an explanation supported by substantial evidence for why this condition was not a severe impairment. Specifically, the ALJ observed that there was some evidence of positive findings on examination (*e.g.*, stiffness and tenderness, a mild positive Tinel's sign, reduced sensation)—evidence that Ms. Incorvia now cites in support of her argument—but

14

Ms. Incorvia's treatment only consisted of Gabapentin and a topical cream for her wrist. (Tr. 26; *see* Tr. 1638-39). Despite being referred to a hand surgeon, Ms. Incorvia failed to show for two scheduled appointments. (Tr. 25; *see* Tr. 552-54, 1335-36, 1643, 1862). Significantly, although not noted in the discussion of carpal tunnel syndrome, the ALJ discussed elsewhere in the decision rheumatology records where Ms. Incorvia was able to make a full fist bilaterally (Tr. 25; *see* Tr. 571) and neurology records observing Ms. Incorvia retained full motor strength in her upper extremities (Tr. 32; *see* Tr. 1763). And while June 2021 treatment notes mentioned that she had a history of carpal tunnel syndrome and noted arthralgia and stiffness in her hands and wrists, as well as small fiber sensory peripheral neuropathy, the ALJ correctly pointed out that these records do not mention any specific treatment plan to address her carpal tunnel syndrome. (*See* Tr. 1867-68). Given these records, it was reasonable for the ALJ to conclude there was insufficient evidence that Ms. Incorvia's carpal tunnel syndrome was a severe impairment. Ms. Incorvia merely presents the same evidence considered by the ALJ and requests a different conclusion. She does not meet her burden in demonstrating that her carpal tunnel syndrome was a severe impairment at Step Two. Accordingly, I find that this Step Two argument lacks merit.

### 3. *Necrobiosis Lipoidica*[3]

Ms. Incorvia argues that ALJ improperly determined that her necrobiosis lipoidica was not a severe impairment. (*See* ECF Doc. 8, PageID#2029-30). She points to the following as evidence that she met her *de minimis* burden at Step Two: (1) the ALJ's acknowledgment that she gets rashes on her legs (Tr. 24); (2) an August 2021 treatment note where Ms. Incorvia reported to her medical provider she had been experiencing these rashes for two years (Tr. 1948); (3) a dermatologist's August 2021 differential diagnosis of necrobiosis lipoidica and order for a punch

---

[3] Necrobiosis lipoidica is a condition typically associated with diabetes, in which one or more yellow, atrophic, shiny lesions develop on the legs. *Necrobiosis Lipoidica*, Stedman's Medical Dictionary 589340 (Nov. 2014).

biopsy (Tr. 1952); and (4) her hearing testimony that she had received results confirming these rashes were related to her diabetes mellitus and caused her legs to be sensitive to touch (Tr. 263, 265). This argument is not well-taken.

The ALJ provided adequate reasoning supported by substantial evidence for the conclusion that Ms. Incorvia's necrobiosis liopoidica was a non-severe impairment. Specifically, as Ms. Incorvia notes, the ALJ acknowledged Ms. Incorvia's hearing testimony that the rashes on her legs are the result of her diabetes. (Tr. 24). But the ALJ also noted that earlier treatment records did not document the presence of a rash or complaints of a rash. (Tr. 24; *see* Tr. 1622 (September 2019 rheumatologic examination indicating that no rash was observed), 1762 (Ms. Incorvia denying rashes and low joint swelling at an April 2020 appointment for lower back pain treatment)). Ms. Incorvia does not point to—nor does independent review of the record reveal—any earlier treatment records showing any indications of a rash or complaints of a rash. (*See, e.g.*, Tr. 560-61, 563, 571). Indeed, as the ALJ observed, the only note regarding a rash in the record is an August 2021 treatment note where Ms. Incorvia reported that she had a rash in her legs for over two years. (Tr. 24; *see* Tr. 1948). And as the ALJ concluded, the diagnosis she received from her dermatologist was not definitive. Rather, the dermatologist offered a *differential diagnosis*[4] of "necrobiosis lipoid diabeticorum versus psoriasis," and then ordered a punch biopsy.[5] (Tr. 24; *see* Tr. 1952); *see Schlacter v. Astrue*, No. 1:08CV617, 2012 WL 567609, at *4 (N.D. Ohio Feb. 21,

---

[4] A differential diagnosis is the "determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings." *Differential Diagnosis*, Stedman's Medical Dictionary 243880 (Nov. 2014); *see also* Cleveland Clinic, *Differential Diagnosis*, https://my.clevelandclinic.org/health/diagnostics/22327-differential-diagnosis (last visited Sept. 7, 2023) ("A differential diagnosis is not your official diagnosis, but a step before determining what could cause your symptoms.").

[5] A punch biopsy is a diagnostic test where a small, tube-shaped piece of skin and other tissue are removed using a special instrument. *See Punch Biopsy*, Stedman's Medical Dictionary 103550 (Nov. 2014).

2012) (finding that ALJ's Step Two finding of a non-severe impairment was supported by substantial evidence, in part, because diagnosis was not definitive).

As support for finding this impairment severe, Ms. Incorvia merely presents the same evidence the ALJ discussed and requests that this Court reach a different outcome—an impermissible request to reweigh the evidence. *See O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (A reviewing court may not "try the case *de novo*, nor resolve conflicts in evidence, nor decided questions of credibility.") (quoting *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)). Given the lack of objective evidence supporting the duration or severity of this impairment, the ALJ reasonably concluded that Ms. Incorvia's necrobiosis lipoidica was not a severe impairment. *See Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) ("If substantial evidence supports the Commissioner's decision, this Court will defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion."). Thus, Ms. Incorvia did not meet her burden in demonstrating that her condition was a severe impairment at Step Two. Accordingly, I find that this sub-claim lacks merit.

#### *4. Small Fiber Neuropathy*

Ms. Incorvia next argues that the ALJ entirely failed to consider her small fiber neuropathy as a severe impairment. (ECF Doc. 8, PageID#2029). She contends that the ALJ, despite acknowledging that Ms. Incorvia suffers from neuropathic symptoms attributable to small fiber neuropathy, did not consider this impairment at Step Two and did not consider whether this neuropathy met the requirements of Listing 11.14. (*Id.*). The Commissioner responds that the ALJ discussed the "limited record" pertaining to Ms. Incorvia's small-fiber neuropathy. (ECF Doc. 10, PageID#2045). The Commissioner contends that while a diagnosis appears in the record for Ms. Incorvia's small-fiber neuropathy, the ALJ articulated evidence that demonstrates it was

reasonable for the ALJ to conclude that Ms. Incorvia had not met her burden of establishing small-fiber neuropathy as a severe impairment. (*Id.*).

As an initial matter, I find that any Step Three argument raised regarding Ms. Incorvia's small-fiber neuropathy is waived. Ms. Incorvia, represented by counsel, conclusorily asserts that her neuropathy "met the requirements of Listing 11.14" at Step Three (ECF Doc. 8, PageID#2029). Yet, despite this assertion, she offers no evidence or argument demonstrating how one would reach this conclusion. (*See id.*). The claimant bears the burden to demonstrate that she reasonably could meet or equal every requirement of a Listing. *Smith-Johnson v. Commissioner of Soc. Sec.*, 579 F. App'x 426, 442 (6th Cir. 2014). Absent any evidence from the claimant, an ALJ does not commit reversible error by failing to evaluate a listing at Step Three. *See Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (holding that ALJ's failure to properly evaluate listing at Step Three is harmless where claimant cannot show that impairments met or medically equaled listing); *Smith v. Kijakazi¸* No. 3:21-cv-02310-JRK, 2023 WL 2973064, at *10-11 (N.D. Ohio Mar. 13, 2023), *report and recommendation adopted sub nom. Smith v. Comm'r of Soc. Sec.*, 2023 WL 2704161 (N.D. Ohio Mar. 30, 2023).  Because Ms. Incorvia fails to adequately raise this issue on appeal, this argument is deemed waived. *McPherson v. Kelsey*, 125 F.2d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to…put flesh on its bones.").

The Commissioner's argument that the ALJ considered Ms. Incorvia's small-fiber neuropathy at Step Two, however, is not well-taken. Certainly, the ALJ dedicated discussion regarding whether carpal tunnel syndrome was a severe impairment. But in discussing the severity

of that impairment, the ALJ failed to specifically address the severity of Ms. Incorvia's small fiber neuropathy. Indeed, the only discussion of small-fiber neuropathy was the following:

> Dr. Craciun's most recent office visit notes from June 2021 mention the claimant's history of bilateral carpal tunnel syndrome, and he notes arthralgia and stiffness in the hands and wrists, as well as small fiber sensory peripheral neuropathy, but does not mention a specific treatment plan to address carpal tunnel syndrome. (Exhibit B19F/43).

(Tr. 26). The ALJ's analysis demonstrates why she found Ms. Incorvia's carpal tunnel syndrome to be a non-severe impairment, but it fails to address, why she found Ms. Incorvia's small-fiber neuropathy to be a non-severe or severe impairment.

Thus, the remaining question is whether the ALJ adequately considered Ms. Incorvia's small fiber neuropathy at later steps in her analysis. Although Ms. Incorvia failed to adequately demonstrate that small fiber neuropathy qualified for a Listing, it is true that the ALJ dedicated no discussion to this impairment at Step Three. (*See generally* Tr. 26-30). The Commissioner appears to construe Ms. Incorvia to be arguing that a medically determinable impairment must result in RFC limitations. (*See* ECF Doc. 10, PageID#2048). This argument is technically correct. *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 426 (6th Cir. 2007) ("The RFC describes the claimant's residual abilities or what a claimant can do, not what maladies a claimant suffers from—though the maladies will certainly inform the ALJ's conclusion about the claimant's abilities. A claimant's severe impairment may or may not affect his or her functional capacity to do work. One does not necessarily establish the other.").

But the Commissioner ignores that it is not harmless error at Step Two where an ALJ fails to consider an impairment if the ALJ fails to consider that impairment at later steps in the sequential analysis. Here, for reasons discussed in greater detail in the next section, the ALJ did

not discuss any medical evidence in connection to Ms. Incorvia's small fiber neuropathy. Thus, the ALJ did not cure this error. Accordingly, I find that this sub-claim has merit.

### 5. *The ALJ Failed to Appropriately Consider Ms. Incorvia's Non-Severe Impairments at Step Four When Crafting the RFC.*

Ms. Incorvia argues that the ALJ erred in the RFC assessment because the ALJ failed to adequately discuss and incorporate limitations for the non-severe impairments (*i.e.,* small fiber neuropathy, carpal tunnel syndrome, and necrobiosis lipoidica) in the RFC determination. (ECF Doc. 8, PageID#2030-32). Specifically, Ms. Incorvia argues that the record "clearly demonstrates" that she had limitations in the use of her fingers, hands, and wrists, and that the record and testimony supported her necrobiosis lipoidica. (*Id.* at PageID#2030). For the reasons set forth below, I agree that the ALJ failed to consider Ms. Incorvia's necrobiosis lipoidica, carpal tunnel syndrome, and small fiber neuropathy in her RFC discussion.

Regarding Ms. Incorvia's necrobiosis lipoidica, the ALJ failed to adequately consider whether Ms. Incorvia's skin condition imposed any limitations in her RFC discussion. When formulating an RFC, an ALJ "must consider the combined effect of all of the claimant's impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." *Kochenour v. Comm'r of Soc. Sec. Admin.*, No. 3:14-CV-2451, 2015 WL 9258609, at *6 (N.D. Ohio Dec. 18, 2015) (quotations marks and alteration omitted) (citing *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 388 (6th Cir. 2013) ("[T]he ALJ's assessment of residual functional capacity reflects a claimant's functional capacity in light of all his limitations, not just those that are severe."). This standard recognizes that "the definition of a non-severe impairment contemplates that non-severe impairments may very well impose *some* type of limitation on basic work activities" and that "an ALJ's conclusion that an impairment is non-severe is not tantamount to a conclusion that the same impairment...does not impose *any* work-related

20

restrictions." *Patterson v. Colvin*, No. 5:14-cv-1470, 2015 WL 5560121, at *4 (N.D. Ohio Sept. 21, 2015) (quoting *Katona v. Comm'r of Soc. Sec.*, No. 14-cv-10417, 2015 WL 87617, at *6 (E.D. Mich. Feb. 27, 2015) (emphasis in original)).

The Commissioner asserts, pointing to the ALJ's testimony and Step Two finding, that the ALJ considered Ms. Incorvia's testimony regarding the effects of her condition. (ECF Doc. 10, PageID#2048-49). I disagree. It is true that the ALJ discussed Ms. Incorvia's testimony regarding necrobiosis lipoidica. (Tr. 31 ("[The claimant] said that she…has sores on her legs that cause pain when they are touched. The claimant reported that she recently had a biopsy to diagnose the cause of the sores. She says that they eventually turn into ulcers, and she has been told they are related to her diagnosis of diabetes mellitus."). But the ALJ then conclusorily stated that: "After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 31).

But what the ALJ failed to do—beyond her Step Two severity discussion—was discuss what limitations, if any, the non-severe skin condition imposed. Notably absent from the RFC discussion is any mention of the skin condition. Instead, the ALJ discussed records related to Ms. Incorvia's back, breathing, and mental impairments. (*See generally* Tr. 31-34). And the Commissioner fails to point to any discussion outside the Step Two analysis that suggests otherwise. Perhaps the ALJ's Step Two analysis could support the conclusion that the ALJ determined that Ms. Incorvia's necrobiosis lipoidica was so minimally limiting that no physical restrictions should factor in the RFC. However, an ALJ's "detailed analysis at [S]tep [T]wo does not relieve the ALJ of her duty to provide an explanation as to the holistic impact of *all*

impairments, both severe and non-severe, specifically in relation to [the claimant's] RFC."
*Kochenour*, 2015 WL 9258609, at *6 (ordering remand despite "recogniz[ing] the depression was
so minimally limiting that no mental restrictions should factor into the RFC) (emphasis in
original); *Revello v. Comm'r of Soc. Sec.*, No. 5:20-CV-01860, 2021 WL 6064784, at *6 (N.D.
Ohio Dec. 22, 2021) (finding that the ALJ, despite the Step Two non-severity finding, erred
because the decision lacked "substantive consideration" potentially caused by the claimant's non-
severe conditions). Beyond the ALJ's boilerplate statement, the RFC discussion lacks any clear
consideration of Ms. Incorvia's skin condition. As a result, the ALJ's minimal discussion failed to
provide a sufficient basis for meaningful judicial review, making it difficult to find a logical bridge
between the evidence and the ALJ's RFC finding.

Whether the ALJ adequately considered Ms. Incorvia's carpal tunnel syndrome and small
fiber neuropathy presents a close call. Reading the decision as a whole, I conclude that the ALJ
did not consider these conditions. The Commissioner invites the Court to infer that because the
ALJ mentioned that Ms. Incorvia saw Dr. Craciun (a neurologist) for a "combination of
impairments," that the ALJ did in fact considered these impairments. (Tr. 32). But this appears to
be a post-hoc rationale for the ALJ's discussion. A careful review of the medical records show that
they contain impressions of carpal tunnel syndrome and small fiber neuropathy. (*See, e.g.*, Tr.
1704, 1741, 1801). And based on these records, the ALJ concluded that Ms. Incorvia's testimony
regarding being unable to grip objects was not supported by the medical evidence. (Tr. 22). The
ALJ, however, discussed these records in connection to the limitations that Ms. Incorvia's back
impairments imposed, *not* her carpal tunnel syndrome and small fiber neuropathy.

For example, the ALJ stated the following:

After careful consideration of the evidence, I find that the claimant's medically
determinable impairments could reasonably be expected to cause the alleged

22

symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record. ***The relevant evidence is summarized below, starting with the claimant's lumbar degenerative disc disease diagnosis and treatment.***

(Tr. 31) (emphasis added).

The ALJ then stated:

Remote treatment records from 2016 document a back injury that contributed to the development of lumbar degenerative disc disease. (Exhibit B4F/9). ***The claimant's back impairments and the limitations it imposes are addressed first in the summary of the evidence of record.***

(*Id.*) (emphasis added).

After discussing several records related to Ms. Incorvia's back impairments, the ALJ noted that Ms. Incorvia saw Dr. Craciun "for a combination of impairments." (Tr. 32). The ALJ then observed that physical examinations from November 2019 and November 2020 documented full strength, a minimal decrease in pinprick in light touch sensation in a stocking glove distribution at the upper limits of the knees and elbows, a broad-based gait (with some antalgia noted in the 2019 examination), and no use of an ambulation aid. (*Id.*). Although the ALJ discussed that Ms. Incorvia saw Dr. Craciun for several impairments, a review of the decision reveals that the ALJ addressed these records in connection to Ms. Incorvia's back impairments—not her carpal tunnel syndrome and small fiber neuropathy—to support her conclusion that the records "do not document anything to support [Ms. Incorvia's] allegations that she falls frequently or is unable to stand unsupported or maintain her grip on objects." (*Id.*). The ALJ's RFC discussion lacks any explicit consideration of Ms. Incorvia's carpal tunnel syndrome and small fiber neuropathy.

In sum, the ALJ's decision fails to explain why no limitations were imposed by Ms. Incorvia's non-severe conditions. Despite a non-severity finding at Step Two, wholly absent from the ALJ's RFC discussion is any mention of Ms. Incorvia's necrobiosis lipodica, carpal tunnel

23

syndrome, or small fiber neuropathy. *See, e.g.*, *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 190-91 (6th Cir. 2009) ("[O]nce it was determined that Simpson suffered from severe physical impairments, … the ALJ was required to consider the impairments resulting from this condition and her adjustment disorder with anxiety and depression in assessing her RFC. Instead, the ALJ held that 'based on my evaluation of the claimant's mental impairment as not a severe impairment … she does not have any limitations stemming from that mental impairment.' The ALJ's finding is contrary to controlling law."); *Garcia v. Comm'r of Soc. Sec.*, 105 F. Supp. 3d 805, 811 (S.D. Ohio 2015) (internal citation omitted) ("In other words, the ALJ found no limitations arising from Plaintiff's mental impairments simply because those impairments were not severe. Such conclusion is error because it conflates the distinct steps of the sequential review process and fails to reasonably explain the absence of limitations arising from Plaintiff's mental impairments. This error is not harmless."); *Hines v. Comm'r of Soc. Sec.*, No. 1:20-CV-01422-JG, 2021 WL 3057090, at *7 (N.D. Ohio June 21, 2021), *report and recommendation adopted*, 2021 WL 3056316 (N.D. Ohio July 20, 2021) (remanding for ALJ to explicitly discuss omitted condition when crafting the claimant's RFC). Accordingly, I recommend that the Court vacate and remand the ALJ's decision to the Commissioner because the ALJ failed to adequately consider Ms. Incorvia's impairments at later steps in the sequential analysis.

### D. <u>The ALJ Failed to Properly Evaluate Ms. Incorvia's Pain and Limitations from Her Necrobiosis Lipoidica.</u>

Ms. Incorvia's final assignment of error argues that the ALJ failed to properly evaluate her pain and the limitations from her necrobiosis lipoidica. (ECF Doc. 8, PageID#2032-35). Specifically, she contends that the ALJ's decision is "devoid of any discussion of [her] testimony regarding the effects of [her] condition." (*Id.* at PageID#2033). She asserts that the ALJ issued a decision 15 days after the hearing, which she contends was "hardly time for…evidence to be

obtained and submitted to the file." (*Id.*) Regardless, Ms. Incorvia argues that the ALJ's decision should be remanded because the ALJ did not take into consideration her skin condition and its effect on her functioning. (*Id.*) Citing to *Deskin v. Commissioner of Social Security*, 605 F.Supp.2d 908 (N.D. Ohio 2008), and its progeny, Ms. Incorvia alleges that the ALJ improperly interpreted raw medical data in functional terms because there was no medical opinion in the record concerning her most recent medical treatment. (*See id.* at PageID#2033-34). Thus, Ms. Incorvia contends remand is necessary for further consideration of her skin condition and its impact on her RFC. (*See id.*).

The Commissioner responds that the ALJ reasonably concluded that Ms. Incorvia's rash was not a severe impairment because the record did not document that the condition had been an enduring problem; the ALJ appropriately considered Ms. Incorvia's symptom testimony and ultimately determined that these allegations were not consistent with the record; and that Ms. Incorvia's reliance on *Deskin* is misplaced because the ALJ is tasked with assessing a plaintiff's RFC, and Ms. Incorvia did not list this condition in her application for disability. (ECF Doc. 10, PageID#2048-50).

In *Deskin*, the court announced a rule that "where the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated nonexamining agency opinion), to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing." 605 F.Supp.2d at 911.

Significantly, however, "*Deskin* has not been universally embraced by courts in this district." *Reidenbach v. Comm'r of Soc. Sec.*, No. 5:21-cv-1880, 2022 WL 3043060, at *8 (N.D. Ohio Aug. 2, 2022). Indeed, one court in this district has stated that *Deskin* "is not representative

of the law established by the legislature, and interpreted by the Sixth Circuit Court of Appeals."
*Henderson v. Comm'r of Soc. Sec.*, No. 1:08 CV 2080, 2010 WL 750222, at *2 (N.D. Ohio Mar.
2, 2010); *see also Berrier v. Comm'r of Soc. Sec.*, No. 3:20 CV 1655, 2022 WL 189855, at *2
(N.D. Ohio Jan. 21, 2022) ("*Deskin* has since been critiqued by other courts in this District.").
Moreover, the Sixth Circuit has held that requiring an ALJ to base the RFC determination on a
physician's opinion "'would, in effect, confer upon the treating source the authority to make the
determination or decision about whether an individual is under a disability, and thus would be an
abdication of the Commissioner's statutory responsibility to determine whether an individual is
disabled.'" *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) (quoting SSR 96-
5p, 1996 WL 374183 (July 2, 1996)).

　　In *Kizys v. Comm'r of Soc. Sec.*, No. 3:10 CV 25, 2011 WL 5024866 (N.D. Ohio Oct. 21,
2011), the court clarified that *Deskin* is "a narrow rule that does not constitute a bright-line test."
*Id*. at *2. *Kizys* held that *Deskin* "potentially applies" only where the ALJ "makes a finding of
work-related limitations based on no medical source opinion or an outdated source opinion that
does not include consideration of a critical body of objective medical evidence." *Id.*

　　Following *Kizys*, courts in this district have recognized that "[w]here an ALJ has opinions
that account for the majority of the medical evidence, an ALJ may reasonably make judgments on
the supportability and consistency of the medical opinions and can adopt residual functional
capacity accordingly." *Phelps v. Comm'r of Soc. Sec. Admin.*, No. 1:21-CV-02295-BYP, 2022 WL
18395824, at *9 (N.D. Ohio Sept. 15, 2022), *report and recommendation adopted*, 2023 WL
316016 (N.D. Ohio Jan. 18, 2023). Moreover, "an ALJ's RFC determination may be supported by
substantial evidence, even if no 'physician offers an opinion consistent with that of the ALJ.'"
*Fergus v. Comm'r of Soc. Sec.*, No. 5:20-CV-02612-CEH, 2022 WL 743487, at *9 (N.D. Ohio

Mar. 11, 2022) (quoting *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018). Indeed, "[t]he Sixth Circuit has repeatedly upheld ALJ decisions where the ALJ rejected medical opinion testimony and determined RFC based on objective medical evidence and non-medical evidence." *Borawski*, No. 1:20-CV-01091-JDG, 2021 WL 811717, at *18 (N.D. Ohio Mar. 3, 2021).

As an initial matter, Ms. Incorvia's assertion that the ALJ's decision is "devoid" of any discussion regarding her skin condition is not entirely accurate. In fact, the ALJ actually referenced her testimony in her Step Two discussion of Ms. Incorvia's skin condition. (Tr. 24 ("At the hearing, she also testified that a persistent rash on her legs is painful and the result of her diabetes."). And the ALJ again discussed the testimony regarding Ms. Incorvia's skin condition in the RFC assessment (although not considering the limitations imposed by the skin condition). (Tr. 31 ("The claimant testified that she…has sores on her legs that causes pain when they are touched. The claimant that she recently had a biopsy to diagnose the cause of the sores. She says that they eventually turn into ulcers, and she has been told they are related to her diagnosis of diabetes mellitus.")). Moreover, the ALJ discussed the medical records regarding Ms. Incorvia's skin condition at Step Two and ultimately determined that the skin condition was a non-severe impairment. (Tr. 24).

Ms. Incorvia argues that the RFC is flawed because there is a critical body of objective medical evidence post-dating the medical source opinions of the state medical examiners—her punch biopsy result. (ECF Doc. 8, PageID#2033). She further argues that the ALJ should have obtained a medical opinion regarding her most recent medical treatment. (*See id.* at PageID#2033-34). This argument is unconvincing because the mere diagnosis of a condition says nothing about the severity of the condition. *See Dyson v. Comm'r of Soc. Sec.*, 786 F. App'x 586, 589 (6th Cir.

2019). Moreover, the ALJ, not a doctor, is tasked with assessing a plaintiff's RFC. *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010) ("An ALJ does not improperly assume the role of a medical expert by weighing the medical and non-medical evidence before rending an RFC finding."). However, as discussed above, the ALJ erred by not appropriately considering Ms. Incorvia's non-severe conditions (including her skin condition) in the RFC determination. Upon remand, the ALJ may determine whether it is necessary to obtain an updated medical opinion regarding Ms. Incorvia's most recent medical treatment.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court VACATE and REMAND the ALJ's decision to the Commissioner.

Dated: September 20, 2023                              s/ *Jennifer Dowdell Armstrong*
                                                      Jennifer Dowdell Armstrong
                                                      U.S. Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge,

making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d 505). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).